J-A02027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., MOTHER | : : : : : : | |
| | : | No. 993 WDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000004-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., MOTHER | : : : : : : | |
| | : | No. 994 WDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000003-2021

BEFORE:   OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED: FEBRUARY 7, 2022**

J.C. (Mother) appeals from the involuntary termination of her parental rights to her daughter, A.M., born in July 2017, and her son, T.M., born in August in 2018 (collectively, Children).[1]  After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] A.S. (Father) is Children's biological father.  Father consented to termination of his parental rights and did not appeal.

The Allegheny County Office of Children Youth and Families (CYF) became involved with this family in March 2019, when Mother took Children to the emergency room at Children's Hospital of Pittsburgh due to the Children having gastrointestinal issues. N.T., 7/16/21, at 110. T.M., who was seven-months-old, was admitted for treatment because he was severely malnourished. *Id.* at 110-11. The court explained:

> Dr. Carmen Coombs [(Dr. Coombs)], an expert in pediatric emergency medicine and child abuse, gave graphic testimony about [T.M.'s] appearance upon admission to the hospital. She testified that [T.M.] was very thin and exhibited "temporal wasting", which means that he had no fat on his face. [T.M.'s] rib cage and bones were visible. He had loose skin on his body because he had no body fat. He was severely malnourished. Dr. Coombs testified that the low weight was so significant that an ordinary person should have observed that the child was severely malnourished.
>
> . . .
>
> Dr. Coombs testified that although there were no concerns of physical abuse, this was a clear case of child neglect. There was no underlying medical reason or issue, which would explain [T.M.'s] low weight and physical condition, other than not receiving enough food. As a result of the malnourishment, [T.M.] had a vitamin D deficiency (rickets). Dr. Coombs also stated that once a child is so malnourished, they may develop a "food aversion" which can continue to place them at risk. Dr. Coombs was concerned that Mother did not seem to appreciate the severity of the problem. [Mother] expressed that she did not feel his low weight was a problem because [T.M.] appeared to be a happy, loving child.
>
> In addition to [T.M.'s] obvious malnourishment and physical condition, Dr. Coombs had other concerns for [T.M.'s] wellbeing. She was concerned that [T.M.] had not had a pediatric appointment since he was two and one-half months old and that the family lacked stable housing. Dr. Coombs also testified that she was concerned that [T.M.] did not have a safe sleeping

environment. She described a safe sleeping environment as an environment where the infant is placed on his back, alone on a hard flat surface with no toys and blankets on which they could choke or suffocate, and importantly—no co-sleeping. She added that in Allegheny County there is approximately one infant death per month due to unsafe sleeping conditions.

In contrast, [T.M.] slept on a pillow or with Mother, putting him at risk for death. Mother did not think that this was a problem.

[T.M.] was born with one extra digit on each hand. According to Dr. Coombs, extra digits are not uncommon, but parents are usually advised to have the extra digits removed because they can be painful and become infected. Mother was advised to have the extra digits removed but declined because she believed that removing the extra digits would upset his "spiritual gifts."

Findings of Fact, 7/22/21, at 2-3 (bulleting omitted).

Based on the foregoing, CYF successfully filed for emergency protective custody of T.M. on April 3, 2019, and of A.M. on April 10, 2019. CYF placed Children in the care of Aa.S. (Paternal Aunt).

On May 7, 2019, the court adjudicated Children dependent. CYF created a family service plan (FSP) for Mother. Mother's objectives included: cooperating and participating with the agency; resolving any outstanding criminal matters; obtaining and maintaining sobriety; obtaining and maintaining safe and appropriate housing; obtaining and maintaining mental health stability; addressing domestic violence; and learning to meet the developmental, medical, and other needs of Children. N.T., 7/16/21, at 155; *see also* Order of Adjudication, 5/7/19.

Mother remained largely noncompliant with her FSP objectives, and on January 8, 2021, CYF filed petitions to involuntarily terminate Mother's

parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). The juvenile court conducted a hearing on July 16, 2021. At the time of the hearing, Children had been in Paternal Aunt's care for 27 months. Mother was present and testified on her own behalf.[2] CYF presented testimony from Dr. Eric Bernstein, Psy.D., a forensic psychologist; City of Pittsburgh Police Sergeant Peter Bechtold and Officers Eric Chesney, Douglas Weaver and Jake Flickinger; Tarraca Jackson, a supervisor with the Allegheny County Health Department Drug and Alcohol Screening Laboratory; Officer Michael Catanzaro with the borough of Wilkinsburg Police Department; William Pipkins, a transportation supervisor at Second Chance; Dr. Coombs; and Diane Riley, the CYF caseworker.

On July 22, 2021, the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). On August 19, 2021, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated Mother's appeals *sua sponte*. On September 23, 2021, the court filed a Rule 1925(a) opinion.

Mother presents two questions for our review:

---

[2] Jeffrey Eisenberg, Esquire, initially represented Mother at the termination hearing. During the proceedings, Mother presented a request to proceed *pro se*, which the court granted. **See** N.T., 7/16/21, at 12-18. Attorney Eisenberg continued to serve as stand-by counsel at the hearing, and represents Mother on appeal.

- 4 -

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 8.

Mother first challenges termination of her parental rights under 23 Pa.C.S.A. § 2511(a). The Pennsylvania Supreme Court has explained:

[A]ppellate courts [must] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

We further recognize that termination involves a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

It is well settled that we only need agree with the court as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we review termination under Section 2511(a)(2) and (b), which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 6 -

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Mother argues the court erred in terminating her parental rights under subsection (a)(2) because CYF presented "insufficient evidence of continued incapacity of Mother to provide essential parental care for the Children." Mother's Brief at 21. Mother states that Children were removed "at different times and under different conditions," and CYF only removed A.M. from Mother's care after Mother lost housing. *Id.* Mother contends she has remedied the housing condition that led to A.M.'s removal. *Id.* Further, Mother suggests her "refusal to remove both [of T.M.'s] extra fingers, infected or not, or Mother's refusal to immunize, cannot be a basis to support a determination that Mother had not remedied the conditions that led to the removal of T.M. … ." *Id.* at 23. We disagree.

The court discussed at length the evidence which led to its conclusion that termination was warranted under Section 2511(a)(2). *See* Orphans' Court Opinion, 9/23/21, 1-5; *id.* at Ex. A. As noted, Children were in the care of CYF for more than two years before CYF filed the termination petitions. N.T., 7/16/21, at 177-78. At the termination hearing, the court accepted into

evidence Children's dependency docket, the report of Dr. Bernstein, Mother's drug screen results, a report authored by Second Chance, a temporary Protection from Abuse (PFA) order between Mother and Father, and Children's hospital records. *Id.* at 60 Ex. 1, 76 Ex. 2, 98 Ex. 3, 136-37 Ex. 4, 192 Ex. 5, 192-93, Ex. 7. Regarding Mother's outstanding criminal matters, the court acknowledged Mother had not resolved her criminal charges, but "given the fact many cases have been postponed or delayed due to the pandemic, this should not be held against Mother." Findings of Fact, 7/22/21, at 5.

Children's case manager, Diane Riley, testified to being assigned to Children's case in December 2020. *Id.* at 138. Ms. Riley reported that CYF continues to have concerns regarding Mother's sobriety. N.T., 7/16/22, at 162. Mother missed drug and alcohol screens and failed to follow the treatment recommended by the POWER assessment. *Id.* Ms. Riley expressed concern that although Mother reported she had a medical marijuana card; Mother has failed to produce the card; and CYF has been unable to verify her medical marijuana patient status. *Id.* at 163.

Regarding Mother's housing, Ms. Riley testified, "Mother has not had stable housing for the life of the case." N.T., 7/16/21, at 158. CYF referred Mother to Allegheny Link and the Urban League and Nova housing programs, but Mother never followed through with the referrals. *Id.* At the time of the termination hearing, Mother was residing in a shelter, but indicated she had secured stable housing. N.T., 7/16/21, at 197. However, in its findings, the

court noted Mother's "history of homelessness," inability to maintain stable housing "during the life" of the case, and the fact that Mother had not obtained stable housing within six months of the filing of the termination petitions. Findings of Fact, 7/22/21, at 5.

As to Mother's goal of obtaining mental health treatment, Ms. Riley testified that Mother's compliance had become more consistent, but was inconsistent from 2019 through the summer of 2020. N.T., 7/16/21, at 160-61. Yet despite Mother's improvement, CYF continued to have concerns about Mother's mental health because Mother had "not followed what the recommended services were. … Although she has been engaged in mental health treatment, it appeared it was not the correct … mental health treatment that was needed to address the concerns." *Id.* at 161.

With respect to Mother's issues with domestic violence, Ms. Riley testified that Mother's compliance was inconsistent. *Id.* at 163. The agency remained concerned about Mother's relationship with Father, including Mother's "pattern of leaving [him] and then stating she does not want contact with [him] and then would contact [him], and have not only phone but physical contact with [F]ather." *Id.* at 164.

Finally, as to meeting Children's developmental, medical and other needs, Ms. Riley explained that prior to Children's dependency adjudication, Mother failed to secure a primary care physician or immunizations for the Children. N.T., 7/16/21, at 158. Ms. Riley stated, "Mother felt that it was not

necessary for the [C]hildren to have immunizations in which it was her personal choice based on her own research." *Id.* at 159. Following Mother's refusal to consent to surgery to remove T.M.'s polydactyl digits after they became infected, Children's foster parents were given authority to make medical decisions on Children's behalf. *Id*. Dr. Bernstein testified:

> [W]e have the matter of questionable medical neglect which ultimately would lead to the involvement of the agency. And I suppose you could even then relate those to some of your earlier questions about matters of insight. And if [Mother] has the understanding of responsibility as a parent to meet all of the children's needs, including of course their physical and medical.

*Id*. at 47-48.

In sum, the record supports the court's determination that Mother's continued incapacity to parent caused Children to be without essential parental care that will not be remedied. Accordingly, we discern no error or abuse of discretion in the court's finding grounds for termination under Section 2511(a)(2).

In her second issue, Mother argues the court improperly terminated her parental rights pursuant to 23 Pa.C.S.A. § 2511(b). She contends "there is no evidence that Mother cannot care" for Children, stating that, "A.M. and T.M. have the right to as much love, comfort, and support in their lives as possible." *Id.* at 26-27.

While the focus of Section 2511(a) is on the parent, the focus of Section 2511(b) is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). The Pennsylvania Supreme Court explained:

- 10 -

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Further, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2003) (citations omitted). "[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d at 732 (child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

Our review discloses that termination of Mother's parental rights under subsection (b) is supported by competent, clear and convincing evidence. The court explained:

- 11 -

The Children also have a positive and strong bond with [Paternal Aunt]'s fiancé … [(Foster Father)]. [Foster Father] possesses appropriate and positive parenting skills.

During the second interactional and bonding assessment [performed by Dr. Bernstein] with Mother and the [C]hildren in June of 2021, [T.M.] left the evaluation without a reason and later indicated that he wanted to return to his foster father … . Mother still has not accepted responsibility for the neglect of [T.M.,] which is highly concerning.

[Paternal Aunt] and [Foster Father] consistently continue to provide for and support the Children's needs. They recognize the importance of the Children's relationship with their parents and are committed to allowing ongoing contact should the Court terminate parental rights. [Paternal Aunt] and [Foster Father] are the psychological parents of [A.M.] and [T.M.].

Termination of parental rights would not have a deleterious impact on these Children. Termination of parental rights and adoption by the foster parents is in the best interest of [A.M.] and [T.M.].

. . .

… Both Children have been in care of their paternal aunt for most of their lives. They are bonded to [her] and her fiancé, whom they view as their psychological parents.

The Children are thriving in this home and deserve to remain in a loving, nurturing and supportive environment in which their needs are met on a permanent basis.

N.T., 7/22/21, at 19-20, 22.

At the termination hearing, Dr. Bernstein testified that Children's needs were being met in their foster home and Children had a strong bond with the foster parents. N.T., 7/16/22, at 43. Dr. Bernstein stated that Children call their foster parents "Tee Tee for the foster mother and Uncle Tony for the foster father. Or alternatively, mom and dad." *Id.* at 43-44. Dr. Bernstein

advocated for termination and endorsed "foster parents as a permanency resource for adoption." *Id.* at 44.

Likewise, Ms. Riley stated she would be concerned if Children were removed from foster parents' home, "[d]ue to [Children's] bond with their foster parents. [Foster Parents] have been consistent with the children for the past 27 months. They have been in their home every day, every night for the past 27 months." *Id.* at 181.

Upon review, the record supports the court's conclusion that termination served Children's developmental, physical and emotional needs. We therefore discern no error or abuse of discretion in the court's determination that termination was warranted under Section 2511(b).

Termination Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/20222